AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☒ INFORMATION ☐ INDICTMENT ☐ SUPERSEDING

---- OFFENSE CHARGED ----

18 U.S.C. § 371 - Conspiracy to Violate the Foreign Corrupt Practices Act;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) - Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Please see attachment.

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**
SAN FRANCISCO DIVISION

---- DEFENDANT - U.S ----

▶ VICENTE EDUARDO GARCIA

DISTRICT COURT NUMBER

**CR 15 366**

(FILED 2015 JUL 13 PM 2:55, CRB, RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA)

---- DEFENDANT ----

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ None

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction } ☐ Federal ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed _____

DATE OF ARREST ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year _____

☐ This report amends AO 257 previously submitted

---- PROCEEDING ----

Name of Complainant Agency, or Person (& Title, if any)
Internal Revenue Service and Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court _____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District _____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE
SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

Name and Office of Person Furnishing Information on this form **MELINDA HAAG**
☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned) **Adam A. Reeves**

---- ADDITIONAL INFORMATION OR COMMENTS ----

PROCESS:
☐ SUMMONS ☒ NO PROCESS* ☐ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____    Before Judge: _____

Comments:

## ATTACHMENT TO PENALTY SHEET

The maximum penalties for a conviction for Conspiracy to violate the Foreign Corrupt Practices Act in violation of 18 U.S.C. § 371 are:

- a five (5) year prison term (18 U.S.C. § 371);
- a $250,000 fine (18 U.S.C. § 3571(b)(4);
- a five (5) year term of supervised release (18 U.S.C. § 3583(b)(1)); and
- a $100 special assessment (18 U.S.C. § 3013(a)(2)(A)).

MELINDA HAAG (CABN 132612)
United States Attorney



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>VICENTE EDUARDO GARCIA,<br><br>  Defendant. | Case No. CR 15 366<br><br>VIOLATIONS: 18 U.S.C. § 371 – Conspiracy to Violate the Foreign Corrupt Practices Act; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture<br><br>SAN FRANCISCO VENUE |

INFORMATION

The United States Attorney charges:

COUNT ONE: (18 U.S.C. § 371 – Conspiracy to Violate the Foreign Corrupt Practices Act)

At all relevant times:

Introduction

1.     The defendant, VICENTE GARCIA ("GARCIA"), was an officer and employee of U.S.-based SAP International, Inc. ("SAP International"), a wholly-owned subsidiary of Germany-based SAP A.G. – now known as SAP SE (collectively, along with all other SAP SE affiliates and subsidiaries, "SAP"), as described more fully below. From in or about June 2009 to December 2013, GARCIA and at least four others ("Advisor," "Consultant A," "Consultant B," and "Partner," described more fully below), engaged in a scheme to pay bribes to foreign officials to secure the award of a technology

INFORMATION

contract to SAP in the Republic of Panama ("Panama").

## The Bribe Payments

2. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-2, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

3. From in or around June 2009 to December 2013, GARCIA, on behalf of SAP, attempted to secure technology-related contracts with the government of Panama. Panama was viewed by SAP as strategically important, as it would showcase SAP's technology in Latin America. By early 2010, GARCIA estimated these contracts to be potentially worth approximately $150 million.

4. The initial contract with the Panamanian government (the "Contract") was for a multi-million dollar technology upgrade package to a state agency. Winning the Contract meant that SAP would be favored to win additional anticipated contracts in Panama, as the government worked to harmonize technology solutions across multiple government agencies. To secure the Contract, GARCIA, Advisor A, Consultant A, Consultant B, and Partner, together with others, agreed to pay bribes to two Panamanian government officials (respectively, "Official A" and "Official B"), as well as to an agent ("Agent A") of a third government official ("Official C") knowing that all or a portion of such money would be offered, given, and promised, directly and indirectly, by Agent A to Official C. The conspirators believed that all three bribe recipients had the ability to influence the approval process for the Contract and to award additional contracts by the Panamanian government. The conspirators agreed to pay the bribe monies through sham contracts and false invoices meant to disguise their true nature.

5. GARCIA, Advisor, Consultant A, Consultant B, and Partner were successful in obtaining the Contract on behalf of Partner's firm ("Channel Partner") for $14.5 million, which included $2.1 million in SAP software licenses. Soon thereafter, the Panamanian government awarded Channel Partner millions of dollars in additional contracts that included the provision of SAP products.

//

INFORMATION                                    2

Relevant Entities and Individuals

6. SAP was a global technology services company with its headquarters in Waldorf, Germany, and offices around the world, including the United States. SAP SE's shares were publicly traded on the New York Stock Exchange as American Depository Receipts ("ADRs"), which tracked SAP SE's listing on the Frankfurt Stock Exchange in Germany. Accordingly, SAP was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

7. SAP International was a Delaware corporation with its principal place of business in Miami, Florida, and had responsibility over SAP's business operations in Latin America. SAP International was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B). SAP International was a wholly-owned subsidiary of SAP SE.

8. GARCIA was employed by SAP International in Miami. GARCIA was a U.S. citizen and resident of Florida. Thus, GARCIA was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A). During the relevant time, GARCIA was a senior executive serving as Regional Director of SAP's Premier Client Network ("PCN") for Latin America and the Caribbean. As the PCN Regional Director, GARCIA was ultimately responsible for sales and services to strategic clients throughout the region.

9. Advisor, an individual whose identity is known to the United States, was employed by SAP in Mexico reporting to GARCIA until March 2010, at which point he left SAP and became an advisor to the Panamanian government, where he was hired to assist with assessing the technology needs of the Panamanian government, including the Contract.

10. Consultant A, an individual whose identity is known to the United States, owned a small technology-related consulting firm in Panama. Consultant A was a long-time acquaintance of Official A and GARCIA. Consultant A died in early 2013.

11. Consultant B, an individual whose identity is known to the United States, worked with Consultant A in Panama.

12. Partner, an individual whose identity is known to the United States, was a principal in a Mexico-based company that sold SAP products and had operations in several countries, including Mexico, Panama, and the United States ("Channel Partner"). Channel Partner was ultimately awarded

INFORMATION                                3

the Contract by the Panamanian government, along with other technology-related contracts.

13. The Panamanian government entity awarding the Contract was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2). In early 2011, the Panamanian government formally awarded the Contract to Channel Partner, which included SAP technology licenses.

14. Official A, an individual whose identity is known to the United States, was a high-level Panamanian government official who had influence over the award of Panamanian government contracts, including the Contract. Official A was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

15. Official B, an individual whose identity is known to the United States, was a high-level Panamanian government official who had influence over the award of Panamanian government contracts, including the Contract. Official B was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

16. Official C, an individual whose identity is known to the United States, was a high-level Panamanian government official who had influence over the award of Panamanian government contracts, including the Contract. Official C was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

17. Agent, an individual whose identity is known to the United States, was a close relative of Official C and could influence Official C.

## The Conspiracy

18. From in or around June 2009 and continuing through in or around December 2013, in the Northern District of California, and elsewhere,

### VICENTE EDUARDO GARCIA

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree with Advisor, Consultant A, Consultant B, Partner, and others known and unknown, to commit offenses against the United States, namely: being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift,

INFORMATION 4

promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist GARCIA, SAP International, and others in obtaining and retaining business for and with, and directing business to, SAP, Channel Partner, Advisor, Consultant A, Consultant B, and others, in violation of Title 15, United States Code, Section 78dd-2(a).

<u>Purpose of the Conspiracy</u>

19. The purpose of the conspiracy was for GARCIA, Advisor, Consultant A, Consultant B, Partner, and others to enrich themselves, SAP, and Channel Partner by making corrupt payments to officials within the Panamanian government in order to obtain, retain, and direct business related to the Contract and future contracts.

<u>Manner and Means of the Conspiracy</u>

20. The manner and means by which GARCIA, Advisor, Consultant A, Consultant B, Partner, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other items, the following:

    a. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, discussed in person, via telephone, and/or via e-mail using computer servers based in the Northern District of California and elsewhere, the need to obtain approval from Official A, Official B, and Official C through Agent, to win the Contract and future contracts.

    b. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, discussed in person, via telephone, and/or via e-mail using computer servers based in the Northern District of California and elsewhere, making bribe payments to Official A, Official B, and

Official C through Agent, to win the Contract and future contracts.

c. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, discussed in person, via telephone, and/or via e-mail using computer servers based in the Northern District of California and elsewhere, the manner and means by which the bribe payments to Official A, Official B, and Official C through Agent, were to be paid.

d. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, attempted to conceal the bribe payments to Official A through the use of sham invoices issued by a company controlled by Official A.

e. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, attempted to conceal the bribe payments to Official B by paying amounts to Advisor who would, in turn, make payments to Official B.

f. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, attempted to conceal the bribe payments of Official C through the use of a sham consulting contract between Channel Partner and a company controlled by Agent.

g. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, caused bribe payments to be made to Official A through the company controlled by Official A.

h. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, agreed to cause bribe payments to be made to Official B through accounts controlled by Advisor.

i. GARCIA, Advisor, Consultant A, Consultant B, and Partner, together with others, while in the United States and elsewhere, agreed to cause bribe payments to be made to a company controlled by Agent.

//

INFORMATION 6

//

Overt Acts

21. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Northern District of California, and elsewhere, at least one of the following overt acts, among others:

    a. On or about June 1, 2009, Official A e-mailed Consultant A about the Panamanian government's plan to harmonize and modernize Panama's technology platform. Consultant A responded, noting he had a "friend and associate" at SAP. Consultant then forwarded the messages to GARCIA that same day; this e-mail, and the majority of e-mails sent to or from GARCIA referenced herein, were routed through the Northern District of California.

    b. On or about February 9, 2010, Consultant A forwarded to GARCIA an e-mail from Official A, in which Official A asked Consultant A to inquire whether GARCIA would set up a "fictional" business trip to Mexico. Official A admitted that, in substance and in part, he really just wanted a recreational trip to Mexico. Consultant A noted in his cover e-mail to GARCIA that if GARCIA did Official A this favor, Official A will "owe us a big one."

    c. On or about February 9, 2010, GARCIA had an invitation letter drafted on SAP Mexico letterhead, inviting Official A to visit Mexico on February 15 and 16, 2010, ostensibly for business purposes. Shortly after sending the letter, GARCIA e-mailed Consultant A, asking: "Any news from [Official A]? Was the document OK for [Official A]? Can you ask [Official A] to finalize a deal for us in Feb-March, I need between $5 and $10 million. Help, please."

    d. On or about February 25, 2010, GARCIA flew from Miami, Florida, to Panama City, Panama, and met with Advisor, Consultant A, Partner, Official A, and Agent.

    e. On or about March 2, 2010, Advisor announced his resignation from SAP.

    f. On or about March 12, 2010, Advisor sent via e-mail a "Work Plan" to Consultant

INFORMATION    7

A, Partner, and GARCIA.

g. In the e-mail identified in the previous paragraph, Advisor detailed his plan to work as an "independent consultant" to the Panamanian government to help define technical specifications for the anticipated Contract, as part of a larger project by the Panamanian government to migrate towards a common technical platform, ostensibly using SAP technology.

h. In or about March 2010, Advisor began working with Official A.

i. On or about March 31, 2010, Consultant A wrote to Advisor and Partner, in substance and in part, that he had spoken with Official A and Agent regarding the anticipated tender for the Contract, and then detailed a "commission" agreement reached with Official A and Agent, whereby Official A was to receive 2%, and Agent 10%, of the Contract. Consultant A also noted, in substance and in part, that Official B may need a bribe as well.

j. In the e-mail identified in the previous paragraph, Consultant A wrote, in substance and in part, that Partner proposed preparing for Agent "a short document, 2 pages max, where commissions of 10% are established for communications, consulting and advisory services," and that Advisor needed to ensure that Channel Partner "has the government accounts assigned."

k. On or about March 31, 2010, Advisor forwarded to GARCIA the e-mail identified in the previous paragraph, noting "Fyi."

l. On or about April 20, 2010, GARCIA, Consultant A, Advisor, and Partner discussed by telephone, in substance and in part, preparing GARCIA to meet again with Official A, Official B, and/or Agent in Panama regarding the Contract and possible contracts with other Panamanian government agencies.

m. On or about May 5, 2010, GARCIA flew from Miami, Florida, to Panama City, Panama.

n. On or about May 7, 2010, GARCIA met with Official A and Official B in Panama, and then flew back to Miami.

INFORMATION 8

o. On or about May 7, 2010, GARCIA e-mailed a number of senior executives at SAP, noting in substance and in part that the business opportunities in Panama were "very promising," with approximately $146 million in Panamanian government technology deals in the pipeline. GARCIA also wrote in part that he had just met with Official A to "validat[e] each opportunity and SAP viability of getting the business during 2010 and 2011."

p. In or about May 2010, SAP determined that – to bid directly for any Panamanian government projects – it either had to open a subsidiary in Panama or, alternatively, allow one of its local partners in Panama to bid with SAP serving as a subcontractor.

q. On or about May 27, 2010, Consultant A sought to reassure Official A via e-mail that Channel Partner would take over for SAP as prime contractor on the Contract bid, noting that GARCIA had "promised" to resolve the matter.

r. On or about May 27, 2010, Official A e-mailed Consultant A, in which Official A, in substance and in part, noted that Partner must also sign with Agent in order to secure any contract with the Panamanian government. Consultant A responded to Official A via e-mail, writing in part: "Remember that SAP isn't the one that's going to sign with the friend [i.e., Agent], since it's an American company, but rather the people from [Channel Partner] were going to do it[;] that was exactly how the friend [i.e., Agent] asked for it."

s. On or about May 27, 2010, Consultant A advised GARCIA and Partner about Consultant A's e-mail chain with Official A identified in the previous paragraphs.

t. On or about June 9, 2010, GARCIA, Consultant A, and Advisor e-mailed one another, confirming that Channel Partner would "give a 10% commission to [Agent and Official C's] family and 2% to [Official A] and 2% to [Consultant A's firm] divided by 2."

u. On or about June 9, 2010, GARCIA responded to the e-mail identified in the previous paragraph, writing that "SAP doesn't really want to pay a commission

INFORMATION 9

and therefore is asking [Channel Partner] to raise the price of the services to cover that issue."

v.  On or about June 9, 2010, Consultant A agreed to share with GARCIA half the money Consultant A's firm was to receive from Channel Partner for the Contract, giving Consultant A and Garcia each 1% of the Contract's amount.

w.  On or about June 17, 2010, Consultant B e-mailed Consultant A, attaching an unexecuted consulting services contract between Consultant A's company and Channel Partner; in substance and in part, the contract obligated Channel Partner to give Consultant A's company 10% of the Contract's value.

x.  On or about June 17, 2010, Consultant A forwarded the e-mail identified in the previous paragraph to Official A, explaining: "This would be the contract between [Channel Partner] and me, and a back-to-back contract between [Consultant A's company] and the new company would be drawn up. This way, no trace remains if SAP conducts an audit [of Channel Partner]. I made it as simple as possible and made it look like a real contract. When you're free, call me. Make any corrections you think necessary."

y.  On or about June 17, 2010, Official A e-mailed Consultant A that Official A advised Agent that: "1. Payment must be under the same terms and conditions as client's payment. 2. Contract between [Agent's Company] and [Channel Partner]. 3. Contract for all business with the government, including the [agency receiving the Contract]."

z.  On or about June 17, 2010, in response to an e-mail from Official A which, in substance and in part, made clear that Channel Partner would need a contract with Agent covering any business with the Panamanian government and not just the Contract, Consultant A replied: "It will be so."

aa. On or about June 18, 2010, Consultant B e-mailed GARCIA an unsigned copy of a consulting agreement between Channel Partner, represented by Partner, and Agent's company, represented by Agent; Consultant B advised GARCIA to "USE

INFORMATION                                   10

|   |     |                                                                                                                                                                                                                                                                                                                                                                 |
|---|-----|---|

1 THIS [DRAFT], IT IS CORRECTED." The agreement provided that Channel Partner will pay Agent's company "10% (ten percent) for performance of its Services and Consulting duties" relating to all "business opportunities" with the Panamanian government.

bb. On or about June 18, 2010, Partner registered Channel Partner to conduct business in Panama.

cc. On or about July 5, 2010, Advisor e-mailed GARCIA and Partner, urging GARCIA to encourage SAP to approve a 90% discount off SAP's list price to Channel Partner.

dd. On or about October 18, 2010, the Panamanian government opened bidding for the Contract.

ee. On or about October 26, 2010, Advisor e-mailed Partner with the subject line "Payment Commitments," and attached two password-protected spreadsheets. One of the spreadsheets attached to the e-mail discussed in the previous paragraph referenced planned "payments" to Official A and Official B of $100,000 and $300,000, respectively.

ff. In or about November 2010, Channel Partner bid $14.5 million for the Contract.

gg. On or about January 31, 2011, after Channel Partner had been awarded the Contract by the Panamanian government, SAP invoiced Channel Partner $1.28 million for part of the amounts due SAP for the licenses Channel Partner re-sold under the Contract.

hh. On or about May 5, 2011, Advisor e-mailed GARCIA, Consultant A, and Partner with the subject header, "Commissions," and wrote: "The matter has already [been] discussed; I am sending the following email to document it: Regarding the project that closed. [Consultant A] gets 125K[,] GARCIA gets 125K[,] [Official A] gets 100K[.] [Consultant A] and [GARCIA] are going to put in 25 each to give to [Official A] so that he will have 150k and [Consultant A] and [GARCIA] will end up with 100K each."

INFORMATION                                        11

ii. On or about July 12, 2011, Channel Partner paid SAP's January 31, 2011, invoice.

jj. On or about October 19, 2011, Advisor e-mailed Official B related to the Contract, and noted that Advisor and Official B would split evenly $274,000 in 2011 and $226,000 in 2012.

kk. On or about December 16, 2011, Consultant A paid $5,000 to Official A in bribes agreed to for the Contract.

ll. On or about December 27, 2011, Advisor wired from a bank in Mexico $28,655 to a bank account in Florida controlled by GARCIA.

mm. On or about January 19, 2012, SAP sent Channel Partner two invoices, $766,713 and $92,583, for amounts due SAP for the licenses Channel Partner re-sold under the Contract.

nn. On or about February 28, 2012, Advisor wired from a bank in Mexico $4,000 to a bank account in Florida controlled by GARCIA.

oo. On or about March 7, 2012, Partner e-mailed a chart to Consultant A detailing amounts to be paid to GARCIA, Official A, and Consultant A as $114,621, $150,000, and $114,621, respectively.

pp. On or about April 11, 2012, Consultant A paid $30,000 to Official A in bribes agreed to for the Contract.

qq. On or about May 8, 2012, Channel Partner made two wire transfers to SAP for payment of the January 19, 2012 invoices, both of which were transferred through a correspondent back account at Citibank in New York, New York, for $766,713 and $92,583, respectively.

rr. On or about May 21, 2012, Consultant A paid $15,000 to Official A in bribes agreed to for the Contract.

ss. On or about July 31, 2012, Advisor wired from a bank in Mexico $17,193 to a bank account in Florida controlled by GARCIA.

tt. On or about October 29, 2012, Advisor wired from a bank in Mexico $40,000 to a bank account in Florida identified by GARCIA.

INFORMATION 12

uu. The bank account identified in the previous paragraph was controlled by a friend of GARCIA's, and GARCIA subsequently directed his friend who owned the bank accounts receiving the funds described in the previous paragraph to use the $40,000 to pay certain of Garcia's personal expenses.

vv. On or about January 9, 2013, Consultant A forwarded to Official A the March 7, 2012, e-mail from Partner, writing: "These are the commissions to be paid by the [Channel Partner]. As you can see, we were each supposed to get 126,413.86, but [GARCIA] and I decided to add our commission to yours, so that you would get 150,000, and that's why we get 114,000. Up to now, you have been paid 45,000 USD from the [Channel Partner's] money; 105,000 is still outstanding, which they will finish paying at around August."

ww. On or about August 13, 2013, Consultant B paid Official A $100,000 in bribes agreed to for the Contract.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)

22. Paragraphs 1 through 21 of this Information are re-alleged and incorporated by reference as if fully set forth herein for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c).

23. The United States hereby gives notice to the defendant charged in this Information that, upon his conviction, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), which require any person convicted of any such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, namely, $85,965.

24. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

Dated: July 13, 2015

MELINDA HAAG
United States Attorney

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

DAVID R. CALLAWAY
Chief, Criminal Division

Approved as to form:

ADAM A. REEVES
Assistant United States Attorney

AISLING O'SHEA
Trial Attorney

INFORMATION                         14